[801 NYS2d 312]

In the Matter of RONALD W., Respondent. NEW YORK CITY ADMINISTRATION FOR CHILDREN'S SERVICES, Respondent. COMMISSIONER OF THE NEW YORK STATE OFFICE OF MENTAL RETARDATION AND DEVELOPMENTAL DISABILITIES, Nonparty Appellant.

First Department, September 27, 2005

## APPEARANCES OF COUNSEL

*Eliot Spitzer, Attorney General*, New York City (*Oren L. Zeve* and *Robert H. Easton* of counsel), for appellant.

*Michael A. Cardozo, Corporation Counsel*, New York City (*Norman Corenthal* and *Kristin M. Helmers* of counsel), for New York City Administration for Children's Services, respondent.

*Steven Banks, The Legal Aid Society*, New York City (*Karen Fisher Gutheil* and *Carol Fegan* of counsel), Law Guardian.

## OPINION OF THE COURT

MAZZARELLI, J.

This appeal presents the issue of whether the Family Court has the power to direct the State Office of Mental Retardation and Developmental Disabilities (State OMRDD), to reevaluate Ronald W. and place him in one of its facilities.

FACTS

Ronald W., the subject of this proceeding, was born on November 28, 1984. He is now 20 years old, is mentally retarded and was probably a victim of sexual abuse as a young child. On September 10, 1987, when he was two years old, Ronald was abandoned by his mother. In that same year, his father was incarcerated for violent sexual crimes. Ronald then came into the foster care system under the authority of the New York City Administration for Children's Services (City ACS).

At the age of four, Ronald W. was performing at the level of a two-year-old. He was acting out sexually, and had made sexual overtures toward his three-year-old sister, Latisha, who was in the same foster home with him. As a result, Ronald and Latisha were removed to separate foster care placements.

By the age of seven, Ronald still needed help with daily living skills. A psychiatrist noted that he had developmental delays,

hyperactivity and a speech disorder. Ronald required medication and psychotherapy to control his hyperactivity. He also required constant supervision to control his dangerous behavior. This conduct included throwing things out windows, sticking his fingers into electrical sockets, and playing with the gas burners on the stove. On August 24, 1994, the parental rights of Ronald's parents were terminated, but Ronald was never adopted.

In 1993, City ACS referred Ronald to State OMRDD to determine whether he was eligible for state services. However, State OMRDD concluded, based upon the information provided by City ACS, that Ronald was clinically ineligible. City ACS requested arbitration of this decision, and the arbitrator found that State OMRDD's conclusion was proper. In 1996, after he became unmanageable in his foster home, Ronald was placed at St. Agatha's Home, a residential treatment center. He was reevaluated by State OMRDD in 1996 and 1999 and found eligible. However, Ronald was not placed by State OMRDD and remained on its waiting list as of 2003.

In June 2002, because City ACS had no appropriate facility available to meet Ronald's needs, he was placed at Hermitage Hall, a residential treatment center in Nashville, Tennessee. Hermitage Hall had particular expertise with juvenile sex offenders. However, as Ronald grew, it became more difficult for Hermitage Hall to cope with him. For example, during the six-month period from April 24, 2003 to November 25, 2003, Hermitage Hall filed five incident reports involving inappropriate sexual behavior by Ronald. Hermitage Hall stated that because of lack of supervision and exposure to the younger population in residence at the facility, Ronald W. presented a danger to the other residents. The facility described Ronald as "dangerous and likely to re-offend due to his limited cognition, lack of insight into his behavior or into the abuse cycle." Hermitage Hall threatened to have Ronald arrested if he was not removed from its facility on November 28, 2003, his nineteenth birthday.

PROCEDURAL HISTORY

In anticipation of the November 28 deadline, City ACS moved on October 30, 2003, for an order, inter alia, directing OMRDD to place Ronald immediately in a State OMRDD facility and directing OMRDD to reimburse City ACS for any expenses incurred by ACS pending placement with OMRDD. In support, City ACS submitted a report by Amy Polenberg, CSW, a child evaluation specialist employed by them. Polenberg stated:

"[Ronald] requires an environment where he can receive treatment for his special needs, as well as supervision and structure. ACS cannot provide such a placement which can guarantee Ronald's safety, as at an ACS facility, he might well be sexually victimized, [and] the safety of younger children [could not] be guaranteed."

Polenberg identified a State OMRDD facility which would meet Ronald's needs. City ACS also brought to the court's attention the incident reports from Hermitage Hall, and its threat to have Ronald arrested if he was not removed by November 28, 2003.

State OMRDD opposed City ACS's application and cross-moved to dismiss it. It argued: (1) that the 1997 arbitration decision upholding OMRDD's 1993 determination barred relief on ACS's claim that OMRDD was obligated to place Ronald; (2) that because OMRRD is a state agency, only the Court of Claims had jurisdiction over the claims against it for monetary relief; and (3) that the proposed order would cause the Family Court either to violate an executive agency's discretionary authority to provide services or force the agency to provide services outside its legislative mandate.

City ACS filed a second motion to direct: (1) that Ronald be immediately placed in an OMRDD facility; (2) that Hermitage Hall allow Ronald to remain there pending determination of the motion; and (3) that State OMRDD's cross motion be denied.

On December 23, 2003, in the first order appealed, the court directed State OMRDD to "arrange immediate re-evaluation of the subject child forthwith," and directed Hermitage Hall to keep Ronald in its care while the evaluation went forward. The parties appeared in court on May 12, 2004, and State OMRDD reported that the reevaluation had determined that Ronald was clinically eligible for its services. The representative from State OMRDD outlined the process for determining whether a prospective facility would be appropriate for Ronald W., and estimated this procedure would take 180 days. That day the court issued the second order appealed. It directed State OMRDD to "immediately place Ronald in an appropriate facility forthwith."

On this appeal, State OMRDD argues that the Family Court lacked authority to order it to place a child in one of its facilities. It urges this Court to vacate both orders appealed. City ACS counters that the court's orders were lawful and appropriate, and that they did not impinge upon the discretion of the

Commissioner of OMRDD. The Law Guardian joins City ACS urging that the Family Court acted within its authority under Family Court Act § 255. State OMRDD also advises this Court, through counsel, that although it brings this appeal, it has placed Ronald in an appropriate facility. While ordinarily this action might make the appeal moot, the appellant correctly contends that, as the issues raised are of a type that are "capable of repetition, yet evading review," we should determine the appeal (*Schall v Martin*, 467 US 253, 256 n 3 [1984]).

STATUTORY BACKGROUND

Article XVII, § 4 of the New York State Constitution authorizes the Legislature to provide for the "care and treatment of persons suffering from mental disorder or defect and the protection of the mental health of the inhabitants of the state." Based on this grant of authority the Legislature created State OMRDD, an autonomous agency within the Department of Mental Hygiene (Mental Hygiene Law § 13.01). Mental Hygiene Law § 13.01, entitled "Declaration of Policy," places certain obligations on the State and local governments. It provides: "The state of New York and its local governments have a responsibility for the prevention and early detection of mental retardation and developmental disabilities and for the comprehensively planned provision of services including care, treatment habilitation and rehabilitation of [such] citizens . . . ." The statute also requires that State OMRDD,

> "and its commissioner shall plan and work with local governments and voluntary organizations and all providers of services, and persons with mental retardation and developmental disabilities and their families and representatives, to develop an effective, integrated, comprehensive system for the delivery of all necessary supports and services to all persons with mental retardation and developmental disabilities and to create financing procedures and mechanisms to support such a system . . . [for these individuals] close to their families and community" (Mental Hygiene Law § 13.01).

Mental Hygiene Law § 13.07 (a) further requires that State OMRDD "shall provide appropriate facilities, programs, supports and services and encourage the provision of facilities, programs, supports and services by local government and community organizations and agencies."

Further, Mental Hygiene Law § 13.15 (a) grants State OMRDD broad discretion to,

"establish . . . and conduct programs and services of . . . care [and] treatment . . . for the benefit of individuals who are mentally retarded and developmentally disabled. Such programs shall include but not be limited to in-patient, out-patient, partial hospitalization, day care, emergency, rehabilitative, and other appropriate treatments and services."

The Legislature has also determined that the State is mainly responsible for individuals over 21 years old and that the City has primary responsibility for children under 21 (*see Palmer v Cuomo*, 121 AD2d 194, 196 [1986]; Education Law §§ 4401, 4402). The State discharges its responsibilities through OMRDD and the Office of Mental Health (OMH),[1] and the City through ACS and other agencies. However, it is anticipated that these state and city agencies will coordinate their work so that children in their charge will have continuous care. For example, Social Services Law § 398 governs the City's duty to care for children with developmental disabilities who are in foster care in New York (Social Services Law § 398 [6] [h]). And another section of that statute requires City ACS to notify State OMRDD and State OMH of the impending need for services for such children when they turn 21 and can no longer be accommodated in foster care. However, no statute or provision requires or precludes State OMRDD from providing services to any eligible individual regardless of age.

PRIOR LITIGATION

This is not the first time that a conflict has arisen between State OMRDD and City ACS over who has responsibility to care for disabled children. In 1985, the City of New York and a number of individual plaintiffs sued State OMRDD, alleging that it had failed to plan and provide placement for foster children referred by City ACS.[2] This litigation was resolved by a court-ordered stipulation, which is in the record. State OMRDD agreed that during the fiscal years 1991-1995, it would find placements for 800 disabled individuals designated "priority placements" by the city agency. The stipulation provided that if

1. OMH is specifically charged with the care of individuals suffering from mental illnesses. Because Ronald W. has not been determined to be mentally ill but rather to be severely or moderately mentally retarded, in that his IQ was measured at 70 in 1992 and 43 at later dates, OMRDD, rather than OMH is charged with determining whether services are available for him.

2. At the time, the city agency was called the Child Welfare Administration (CWA).

the City and State OMRDD did not agree about whether a specific child was clinically eligible for State OMRDD care, the City was entitled to request arbitration, which would be binding.

State OMRDD interpreted the stipulation to expire after it had made 800 placements, but the City disputed this contention. The parties agreed to extend the stipulation until October 31, 1997. Apparently, between 1997 and March 2004, State OMRDD has voluntarily followed the agreement and placed approximately 200 eligible children per year.

APPLICABLE LAW

In this case, the Family Court relied upon section 255 of the Family Court Act when it ordered Ronald's reevaluation and placement. The relevant portion of that section provides:

> "It is hereby made the duty of and the family court or judge thereof may *order, any agency or other institution to render such information, assistance and cooperation as shall be within its legal authority* concerning a child who is or shall be under its care, treatment, supervision or custody as may be required to further the objects of this act" (emphasis added).

This section gives the Family Court flexibility and potency when dealing with government agencies. However, that power is not unlimited. This Court has repeatedly held that the authority granted to the Family Court pursuant to Family Court Act § 255 does not extend to the issuance of an order directing executive agencies to take specific discretionary action. For example, in *Matter of Hasani B.* (195 AD2d 404 [1993]), we held that Family Court Act § 255 does not authorize the court to compel a city agency to deem a legal guardian a foster parent. In addition, in *Matter of Enrique R.* (126 AD2d 169 [1987]), we held that Family Court Act § 255 does not authorize the court to direct the City Commissioner of Social Services to assist a grandmother in obtaining housing so she could gain custody of a grandchild.

Moreover, the Court of Appeals has held that section 255 does not give the court "overview [power] of the lawful acts of appointive and elective officials involving questions of judgment, discretion, allocation of resources and priorities" (*Matter of Lorie C.*, 49 NY2d 161, 171 [1980]). In *Lorie C.*, Family Court had established a plan detailing the responsibilities, standards and procedures for juvenile delinquents and

persons in need of supervision placed in family boarding homes. The plan further provided that any government employee or law guardian should report any violation of the plan to the court "so that proceedings for enforcement [could be] had" (*id*. at 164). The Court of Appeals held that Family Court had exceeded its authority under section 255 because the court's actions "encroached upon powers granted by section 398 of the Social Services Law to the Department of Social Services" (*id*. at 166).

In discussing this encroachment, the Court of Appeals addressed the issue of whether misuse of Family Court Act § 255 could violate the doctrine of the separation of powers. It is a settled principle that as between the executive, legislative and judicial branches of government, none of the three are subordinate, but all are coordinate, independent and coequal. "The sound application of a principle that makes one master in his own house precludes him from imposing his control in the house of another who is master there" (*Humphrey's Executor v United States,* 295 US 602, 630 [1935]). Separation of powers is integral to our system of government, and courts are bound to act within their designated realm. Each branch of government "should be free from interference, in the discharge of its peculiar duties, by either of the others" (*Matter of Lorie C.,* 49 NY2d at 171 [internal quotation marks omitted]).

The action of the Family Court in this case, in ordering the reevaluation and placement of Ronald, constituted just the sort of improper action which the Court of Appeals precluded in *Lorie C.* (*supra*). Nor could the action of the Family Court be justified as a proper exercise of the power of mandamus. A court can only compel an action by an administrative agency where it is ordering the performance of a ministerial, nondiscretionary act. And, the party seeking the relief must have a clear legal right thereto (*Matter of Altamore v Barrios-Paoli,* 90 NY2d 378, 385 [1997]; *Matter of Savastano v Prevost,* 66 NY2d 47, 50 [1985]; *Klostermann v Cuomo,* 61 NY2d 525, 539 [1984]).

Neither of these criteria is satisfied here. Various provisions of the Mental Hygiene Law vest the State OMRDD with broad discretion to determine who will be placed at which of its facilities. And the Commissioner is allowed to make these decisions

based upon available resources and competing priorities.[3] Nor does any child have an absolute entitlement to adult services.[4]

Furthermore, the Court of Appeals has previously sustained the agency's exercise of discretion under the Mental Hygiene Law. In *Savastano* (*supra*), a CPLR article 78 proceeding was brought on behalf of 25 patients at Creedmoor Psychiatric Center, a facility under the jurisdiction of the Commissioner of the State OMH, and the petition sought the transfer of patients to a State OMRDD facility. The Court of Appeals reversed orders of both the IAS court and the Appellate Division, which had ordered the transfers. The Court of Appeals concluded that an order of mandamus did not lie because relevant sections of the Mental Hygiene Law vested discretion to make such a determination squarely within the province of the State OMRDD (*Savastano, supra,* 66 NY2d 47, 50 [1985]). Those sections similarly preclude the action of the Family Court here.

Since the court's actions here were not authorized by Family Court Act § 255, and the directives in the orders appealed violate the doctrine of separation of powers and impinge upon the discretionary authority of the State OMRDD under the Mental Hygiene Law, they must be reversed. However, it bears emphasizing that our reversal of the orders appealed should not affect State OMRDD's current placement of Ronald W. in what it deems an appropriate facility inasmuch as State OMRDD found him eligible for services, and he will shortly be 21 years of age.

Accordingly, the orders of the Family Court, New York County (Sara P. Schechter, J.), entered on or about December 23, 2003 and on or about May 12, 2004, which, respectively, directed State OMRDD to arrange immediate reevaluation of Ronald W., and then ordered State OMRDD to place Ronald W. in an ap-

---

3. The Commissioner may "defer admissions to any facility in the department when the total number of patients therein exceeds its capacity to an extent which will not permit adequate care and treatment to be provided patients" (Mental Hygiene Law § 29.07 [a]). State OMRDD will "take all actions that are necessary, desirable, or proper to implement the purposes of this chapter and to carry out the purposes and objectives of the office within the amounts made available therefor by appropriation, grant, gift, devise, bequest, or allocation from the mental hygiene services fund" (Mental Hygiene Law § 13.15 [a]).

4. "Nothing in this section [related to planning and referral of mentally retarded and developmentally disabled children for adult care] shall be construed to create an entitlement to adult services" (Mental Hygiene Law § 13.37 [g]).

propriate facility "forthwith," should be reversed, on the law, without costs, and the orders vacated.

BUCKLEY, P.J., ANDRIAS, SAXE and FRIEDMAN, JJ., concur.

Orders, Family Court, New York County, entered on or about December 23, 2003 and on or about May 12, 2004, reversed, on the law, without costs, and the orders vacated.