(May 13, 2008)

■ In the Matter of BRIAN L., Also Known as MARIAH L., Respondent, v ADMINISTRATION FOR CHILDREN'S SERVICES, Appellant. [859 NYS2d 8]—

Order, Family Court, New York County (Sheldon M. Rand, J.H.O.), entered on or about February 21, 2007, which granted the Law Guardian's motion for an order directing the Administration for Children's Services (ACS) to arrange for petitioner to have sex reassignment surgery and denied ACS' cross motion to dismiss the proceeding, unanimously reversed, on the law, without costs, the motion denied, the cross motion granted and the proceeding dismissed.

Petitioner was born a biological male but at some point during adolescence was diagnosed with gender identity disorder (GID), "which the American Psychiatric Association characterizes as a disjunction between an individual's sexual organs and sexual identity" (*Smith v City of Salem, Ohio*, 378 F3d 566, 568 [6th Cir 2004], citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, at 576-582 [4th ed 2000]).[1] Petitioner began receiving mental health and medical care for GID, including psychological and psychiatric treatment and hormone therapy aimed at developing secondary female sex characteristics. ACS was responsible for arranging and paying for petitioner's medical care since she was in foster care between 1995 and April 2006.[2]

In December 2005, petitioner, through her former Law Guardian, made a motion in Family Court seeking to compel ACS to provide her with all medical treatment recommended by her doctors for GID, including sex reassignment surgery, which for

---

**1.** In accordance with petitioner's preference, we refer to her using feminine pronouns.

**2.** In April 2006, after she commenced this proceeding, petitioner turned 21 years old and was discharged from foster care. ACS does not contend, however, that this proceeding has been rendered moot by those events.

male-to-female individuals " 'involves the removal of the external male sexual organs and the construction of an artificial vagina by plastic surgery. It is supplemented by hormone treatments that facilitate the change in secondary sex characteristics,' such as breast development" (*Ulane v Eastern Airlines, Inc.*, 742 F2d 1081, 1083 n 4 [7th Cir 1984], *cert denied* 471 US 1017 [1985], quoting Comment, *Transsexualism, Sex Reassignment Surgery, and the Law*, 56 Cornell L Rev 963, 970 n 37 [1971]).

The motion was supported by the written reports of a psychologist, a psychotherapist and two medical doctors, each of whom had evaluated petitioner to determine whether she was a suitable candidate and ready for sex reassignment surgery. The psychologist, Rachlin, who specialized in treating GID, stated that, under the Standards of Care for GID published by the Harry Benjamin International Gender Dysphoria Association (the Harry Benjamin standards),[3] petitioner was both eligible and ready for sex reassignment surgery. Rachlin also stated that the surgery was necessary for petitioner's emotional well-being. Wheeler, the psychotherapist, who specialized in diagnosing and treating GID, also concluded that, based upon the Harry Benjamin standards, petitioner was eligible and ready for sex reassignment surgery. Wheeler averred that sex reassignment surgery was medically necessary to alleviate petitioner's depression, anxiety disorder and post-traumatic stress disorder. Kreditor, a medical doctor, determined that sex reassignment surgery was indicated for petitioner because without it her emotional and behavioral problems, e.g., anxiety, borderline personality disorder, would "deteriorat[e]," thereby "hinder[ing] further relationship, adjustment, personal and professional growth." Lastly, Bartalos, an internist who provided petitioner with medical gender reassignment treatment, i.e., hormones, stated that sex reassignment surgery would provide petitioner with "[a] more perfect alignment of the appearance of [her] body and [her] mental gender," and was the "next needed step" in the course of her treatment.

ACS opposed the motion on the ground that it was only permitted to pay for medical treatments approved by Medicaid law and that Medicaid law prohibited payment for sex reassignment surgery. No evidence was submitted in support of the agency's opposition. Family Court granted the motion and

---

**3.** Both the medical professionals and ACS Assistant Commissioner Pratt rely upon and discuss the Harry Benjamin standards, which articulate standards regarding the psychiatric, psychological, medical and surgical management of GID.

directed ACS to arrange for petitioner to have the surgery, and ACS appealed.

A prior panel of this Court reversed the order and remanded the matter to ACS for further proceedings (32 AD3d 325 [2006]). The panel stated that "[w]hile the record contains evidence that the operation is the generally recognized successful treatment for gender identity disorder, the record is incomplete, and, therefore, this issue is not yet ripe for determination" (*id.* at 326). The panel directed ACS to provide Family Court "with a clear statement of the reasons for denial of this surgery" to facilitate meaningful judicial review of ACS' determination (*id.*).

Upon remand, ACS supplemented the record before Family Court with the affidavit of Pratt, its assistant commissioner in charge of matters related to the provision of medical services to foster children under ACS' care. Pratt explained that petitioner was a foster child who received medical care pursuant to article 5, title 11 of the Social Services Law, the state Medicaid law, and that "her [medical] coverage is defined by and limited by the Medicaid statute and regulations." Pratt further explained that state Medicaid law prohibited ACS from paying for sex reassignment surgery.

Pratt stated that, even assuming that ACS could legally pay for the surgery, it would not do so as a matter of discretion, because petitioner had not satisfied certain eligibility requirements for sex reassignment surgery under the Harry Benjamin standards. Specifically, petitioner did not have a psychological evaluation and psychotherapy if required or recommended, and she lacked demonstrable knowledge of costs, procedures, complications of various surgical procedures and an awareness of different competent surgeons. Pratt also stated that petitioner had not evinced that she was ready for the surgery under the criteria set forth in the Harry Benjamin standards; petitioner, according to Pratt, did not demonstrate that she had a stable, enduring and comfortable gender identity, and she did not show progress in dealing with work, family and interpersonal issues. Pratt averred, based upon multiple conversations with petitioner and information imparted to her by foster care staff, that petitioner "simply has not demonstrated the kind of serious, thoughtful, and committed approach that would, as a matter of basic logic, be expected of anyone appropriately planning for this type of fundamental and serious surgical process. Rather, she has behaved in a manner that is indecisive, unstable, and self-defeating, and has been all but impossible to engage in meaningful planning on this or any other vital issue."

With respect to the recommendations of the medical profes-

sionals submitted by petitioner indicating that she was a suitable candidate for sex reassignment surgery, Pratt stated that none of the recommendations "indicate that [petitioner] has either knowledge of the costs, procedures, and complications of various surgical approaches to the surgery . . . , or that she has given any thought or showed any awareness of different competent surgeons."

Petitioner moved for summary judgment directing ACS to arrange for her sex reassignment surgery, and ACS cross-moved for summary judgment declaring that it had no such obligation. Family Court granted the motion, denied the cross motion and directed ACS to make arrangements for petitioner to have the surgery. This appeal by ACS ensued.

Contrary to petitioner's contention, ACS is not barred from pressing its claim that, pursuant to Medicaid law, it is precluded from paying for sex reassignment surgery. ACS did raise this argument before Family Court in opposition to petitioner's initial motion and before this Court on ACS' appeal from the order deciding that motion. In reversing that order and remanding for further proceedings, however, we did not expressly or implicitly pass on the merits of that argument. Rather, we concluded that ACS "should have provided the Family Court with a clear statement of the reasons for denial of this surgery, and, consequently, we remand[ed] for that purpose" (32 AD3d at 326 [citation omitted]). Thus, the law of the case doctrine does not bar ACS from asserting on this appeal that it is precluded under Medicaid law from paying for sex reassignment surgery (*see Metropolitan Package Store Assn. v Koch*, 89 AD2d 317, 321-322 [1982] [law of the case doctrine "is not inflexible, and applies only to issues decided, directly or by implication, at an earlier stage of the action" (citation omitted)], *appeal dismissed* 58 NY2d 1112 [1983], *appeal dismissed* 464 US 802 [1983]; *see also People v Evans*, 94 NY2d 499, 503-504 [2000]).

With respect to the substance of that assertion, petitioner and ACS agree that ACS was obligated to provide petitioner with medical and surgical care under Social Services Law § 398 (6) (c). That provision requires local governmental officials responsible for certain classes of children to: "Provide necessary medical or surgical care in a suitable hospital, sanatorium, preventorium or other institution or in his [or her] own home for any child needing such care and pay for such care from public funds, if necessary. However, in the case of a child or minor who is eligible to receive care as medical assistance for needy persons pursuant to title eleven of article five of this chapter, such care shall be provided pursuant to the provisions of that title." (*Id.*)

In essence, ACS asserts that Social Services Law § 398 (6) (c) creates two tiers of health care for children under ACS' care— one tier for children who, like petitioner, are entitled to receive medical assistance for needy persons pursuant to title 11 of article 5 of the Social Services Law, the state Medicaid law, and another tier for all other children under ACS' care. Pointing to the second sentence of Social Services Law § 398 (6) (c), ACS maintains that the scope of the medical and surgical care available to children in the former tier is limited to the care that is authorized by state Medicaid law, which precludes payment "for care, services, drugs, or supplies rendered for the purpose of gender reassignment . . . or any care, services, drugs, or supplies intended to promote such treatment" (18 NYCRR 505.2 [l]; see NY Reg, July 16, 1997, at 26; NY Reg, Mar. 25, 1998, at 5). Children in the other tier, i.e., all those children in ACS' care who are not entitled to receive medical assistance under Medicaid law, receive the health care authorized in the first sentence of Social Services Law § 398 (6) (c)—"[all] necessary medical or surgical care in a suitable hospital, sanatorium, preventorium or other institution or in his [or her] own home."

Petitioner argues that Social Services Law § 398 (6) (c) does not create separate health care schemes for children in ACS' care based on the children's eligibility for Medicaid benefits. Rather, petitioner asserts that ACS is required under Social Services Law § 398 (6) (c) to provide all children under its care with all necessary medical and surgical treatment. The second sentence of section 398 (6) (c), in petitioner's view, merely stipulates that when a child is eligible for Medicaid and the treatment needed by the child is covered by that program, Medicaid funds must be used to pay for the treatment. Thus, when Medicaid will not cover the costs of a necessary treatment for a child eligible for Medicaid, ACS must pay for the treatment.

"A court must consider a statute as a whole, reading and construing all parts of an act together to determine legislative intent, and, where possible, should harmonize all parts of a statute with each other and give effect and meaning to the entire statute and every part and word thereof" (*Friedman v Connecticut Gen. Life Ins. Co.*, 9 NY3d 105, 115 [2007] [internal quotation marks, citation, ellipses and brackets omitted]). Moreover, clear and unambiguous statutory language should be construed so as to give effect to the plain meaning of the words used (*see People v Finnegan*, 85 NY2d 53, 58 [1995], *cert denied* 516 US 919 [1995]).

The first sentence of Social Services Law § 398 (6) (c), in clear

and unambiguous terms, states that ACS must "[p]rovide necessary medical or surgical care in a suitable hospital, sanatorium, preventorium or other institution or in his [or her] own home for *any child needing such care and pay for such care from public funds, if necessary*" (emphasis added). The plain meaning of that sentence—and the one that gives it effect—is that ACS has a duty to provide necessary medical and surgical care to *all* of the children in its care and must, if necessary, pay for that care. The second sentence of that section, read in a manner that gives it effect and places it in harmony with the first, identifies the source from which certain medical expenditures must be paid; that sentence does not mean that children in ACS' care who are eligible for Medicaid are limited to the medical and surgical care covered by that program.

While ACS has a duty to provide necessary medical and surgical care to all of the children in its care and must, if necessary, pay for that care, the question remains whether ACS can be judicially compelled to pay for petitioner's sex reassignment surgery. ACS' position is that Family Court does not have the power to order ACS to arrange for the surgery and that Family Court's order encroaches upon ACS' authority to provide medical and surgical care to children under ACS' care. Thus, ACS asserts that it has discretion to determine whether a particular medical treatment is necessary and that this determination may not be disturbed unless it lacks a rational basis. Citing Pratt's affidavit, ACS urges that its decision not to arrange for petitioner's sex reassignment surgery has a rational basis. Petitioner argues that ACS has an obligation under Social Services Law § 398 (6) (c) to arrange for her to have the surgery, that ACS failed to articulate a reasonable basis for its decision not to arrange it, and, thus, Family Court had the authority to order ACS to do so.[4]

Petitioner identifies two provisions of the Family Court Act

---

4. Petitioner, by way of a motion to supplement her 66-page brief made one day before oral argument, attempts to assert the argument that ACS was required under federal Medicaid law to arrange for her sex reassignment surgery. This argument was never previously raised in this proceeding, and we decline to consider it. Moreover, petitioner does not assert that ACS was required to arrange for the surgery pursuant to Social Services Law § 365-a (state Medicaid law). To the contrary, petitioner waived any such argument in both her papers submitted to Family Court and her brief in this Court ("ACS is correct that [Social Services Law § 365-a] is limited to procedures covered by Medicaid and therefore is not applicable here"). Similarly, no argument has been advanced that Family Court was authorized to order the surgery under Family Court Act § 233 ("Whenever a child within the jurisdiction of the court appears to the court to be in need of medical, surgical, therapeutic, or hospital care or treatment, a suitable order may be made therefor").

that authorize Family Court to direct ACS to provide services to a person in foster care, Family Court Act §§ 255 and 1015-a. Family Court Act § 255 states, in pertinent part, that: "It is hereby made the duty of, and the family court or a judge thereof may order, any state, county, municipal and school district officer and employee to render such assistance and cooperation as shall be within his [or her] legal authority, as may be required, to further the objects of this act . . . . It is hereby made the duty of and the family court or judge thereof may order, any agency or other institution to render such information, assistance and cooperation as shall be within its legal authority concerning a child who is or shall be under its care, treatment, supervision or custody as may be required to further the objects of this act."

In *Matter of Lorie C.* (49 NY2d 161 [1980]), the Court of Appeals discussed the scope of Family Court's authority to direct governmental agencies to act under Family Court Act § 255. The petitioner in *Lorie C.* was adjudged a person in need of supervision, and placed in the custody of the St. Lawrence County Department of Social Services and under the supervision of that county's probation department. While the petitioner was to be placed in foster care, the probation department insisted that she be placed in a home within a school district in which the department of social services had exhausted its resources. Thus, the department of social services wanted to place the petitioner in another district. At an informal hearing to resolve the issue of the petitioner's placement, Family Court inquired whether a program for reserve foster home accommodations that the department of social services had previously been directed to establish had in fact been implemented. After the petitioner was placed in a foster home, Family Court continued the proceeding and held hearings regarding whether the department of social services should be ordered to maintain a reserve of potential foster homes to eliminate delay in placing children such as the petitioner. Family Court ultimately entered an order, over the department of social services' objection, approving a plan that allocated responsibilities between that department and the probation department with respect to the placement of children in foster homes. The plan also established standards and procedures for such placements, and required that the plan be implemented and followed by the department of social services and the probation department.

The Court of Appeals affirmed an order of the Third Department reversing the order. Noting that Social Services Law § 398 (6) (h) provided commissioners of public welfare with the

responsibility to supervise certain classes of children until they become 21 years old, are discharged or are adopted, the Court concluded that the plan set forth in Family Court's order impermissibly treaded upon the department of social services' statutory authority. Thus, the Court stated that while "section 255 authorizes an order requiring the doing of an act within the legal authority of the official to whom the order is directed the power to order 'assistance and cooperation' cannot be read as permitting an order which denigrates from that officer's statutory authority, any more than it can be read as expanding such an official's authority into areas not granted by statute" (49 NY2d at 171). Relatedly, the Court observed that "courts do not normally have overview of the lawful acts of appointive and elective officials involving questions of judgment, discretion, allocation of resources and priorities," and that "it is a fundamental of the doctrine of distribution of powers that each department should be free from interference" (*id.* [internal quotation marks omitted]; *see Matter of Ronald W.*, 25 AD3d 4 [2005]).

Like the authority to supervise certain classes of children, the authority to provide necessary medical and surgical care to such children is conferred in clear and unambiguous language upon commissioners of public welfare and city public welfare officers, such as the Commissioner of ACS, by Social Services Law § 398 (6) (*see Matter of Arlene L.*, 187 Misc 2d 356, 357 [Fam Ct, NY County 2001] ["the Commissioner (of ACS) has a nondelegable statutory duty to provide all necessary medical care and treatment for children placed in the care of (ACS)"]).[5] Thus, Family Court Act § 255 cannot be read as permitting Family Court to order ACS to arrange for a child in its care to receive specific medical or surgical care, since such an order would denigrate from ACS' statutory authority (*see Matter of Lorie C.*, 49 NY2d at 171; *see also Matter of Ronald W., supra* [Family Ct Act § 255 does not give Family Court power to order New York State Office of Mental Retardation and Developmental Disabilities, which has statutory responsibility for providing services for the mentally retarded and developmentally disabled, to reevaluate person for eligibility for services provided by the Office]; *Matter*

---

**5.** While reference to the relevant statutory headings is not necessary since Social Services Law § 398 (6) is unambiguous (*see* McKinney's Cons Laws of NY, Book 1, Statutes § 123 [b] [headings may be considered where statute ambiguous]), the headings of both the title of the article within which section 398 falls ("Powers and Duties of Public Welfare Officials") and of section 398 itself ("Additional powers and duties of commissioners of public welfare and certain city public welfare officers in relation to children") buttress the conclusion that the Legislature conferred upon ACS the authority to provide necessary medical and surgical care to children under its care.

*of Enrique R.*, 126 AD2d 169 [1987] [Family Court Act § 255 does not authorize Family Court to direct Commissioner of Social Services to commence special proceeding against New York City Housing Authority on behalf of foster child and his grandmother]).

Petitioner's assertion that 18 NYCRR 441.22, when read in conjunction with Social Services Law § 398 (6) (c), imposes upon ACS "an unqualified and nondiscretionary obligation" to arrange for her to have sex reassignment surgery, such that Family Court had the authority under Family Court Act § 255 to order ACS to arrange for the surgery, is without merit.

Subdivision (a) of section 441.22 states that "[e]ach authorized agency[, such as ACS,] is responsible for providing comprehensive medical and health services for every foster child in its care." Subdivision (f) (1) of that section directs that children in foster care must have "periodic individualized medical examinations" and sets forth the intervals at which such examinations must take place. Paragraph (2) of subdivision (f) states that the examinations must include:

"(i) a comprehensive health and developmental history;

"(ii) a comprehensive unclothed physical examination;

"(iii) an assessment of immunization status and provision of immunizations as necessary;

"(iv) each periodic medical examination of a child that occurs after the initial assessment of the child for risk factors related to HIV infection in accordance with subdivision (b) of this section, must include an assessment by designated agency staff of whether HIV-related testing of the child is recommended . . . ;

"(v) an appropriate vision assessment;

"(vi) an appropriate hearing assessment;

"(vii) laboratory tests as appropriate for specific age groups or because the child presents a history or symptoms indicating such tests are necessary;

"(viii) dental care screening and/or referral . . . . ; and

"(ix) observation for child abuse and maltreatment which, if suspected, must be reported to the State Central Register of Child Abuse and Maltreatment as mandated by section 413 of the Social Services Law."

Subdivision (g) of section 441.22, the linchpin of petitioner's argument, provides that "[w]hen the medical examination indicates a condition requiring follow-up care as determined by the child's physician, the agency responsible for the child's care must provide or arrange for such follow-up care as recommended by the child's physician."

Subdivision (g) does not apply to petitioner's situation. That subdivision applies "[w]hen *the medical examination* indicates a condition requiring follow-up care as determined by the child's physician" (emphasis added). "[T]he medical examination" is a reference to one of the periodic medical examinations required by subdivision (f). Concomitantly, under the language of subdivision (g), an agency responsible for a child's medical care must provide follow-up care as recommended by the child's physician for conditions detected or diagnosed during periodic medical examinations. Here, however, a periodic medical examination did not indicate a condition requiring follow-up care. Rather, in 2004 ACS arranged for petitioner to be evaluated by Rachlin, a psychologist, because petitioner had expressed an interest in having sex reassignment surgery; petitioner was subsequently evaluated by Wheeler, a psychotherapist, and Drs. Kreditor and Bartalos.

Even assuming that section 441.22 (g) is applicable (i.e., a periodic medical examination indicated that petitioner required follow-up care and petitioner's physician recommended a specific course of action), it could not be given the effect petitioner urges. As discussed above, the Legislature conferred upon commissioners of public welfare and city public welfare officers, including the Commissioner of ACS, the authority and responsibility to provide necessary medical and surgical care to children under their care (Social Services Law § 398 [6] [c]; *see Arlene L.,* 187 Misc 2d at 357). Thus, a regulation cannot restrict or impair those officers' authority (*see Weiss v City of New York,* 95 NY2d 1, 4-5 [2000] ["It is a fundamental principle of administrative law that an agency cannot promulgate rules or regulations that contravene the will of the Legislature"]; *Finger Lakes Racing Assn. v New York State Racing & Wagering Bd.,* 45 NY2d 471, 480 [1978] ["Of course, the Board is without power to promulgate rules in contravention of the will of the Legislature. Administrative agencies can only promulgate rules to further the implementation of the law as it exists; they have no authority to create a rule out of harmony with the statute" (internal quotation marks omitted)]). As section 441.22 (g) would be "out of harmony" with Social Services Law § 398 (6) (c) to the extent the regulation purported to substitute the discretion of a foster child's physician for that of the public officer charged with responsibility for ensuring that the child receives necessary medical and surgical care, the statute prevails and the regulation does not require the public officer to provide or arrange for whatever follow-up care may be recommended by the child's physician (*see Weiss,* 95 NY2d at 5).

Petitioner, with a brief reference to the statute, also asserts

that Family Court had the power to order ACS to arrange for her sex reassignment surgery under Family Court Act § 1015-a. That section states that: "In any proceeding under . . . article [10 of the Family Court Act], the court may order a social services official to provide or arrange for the provision of services or assistance to the child and his or her family to facilitate the protection of the child, the rehabilitation of the family and, as appropriate, the discharge of the child from foster care. Such order shall not include the provision of any service or assistance to the child and his or her family which is not authorized or required to be made available pursuant to the comprehensive annual services program plan then in effect." Thus, in limited and defined circumstances, Family Court has discretion to order a social services official to provide or arrange for services for a child. Family Court cannot order a social services official to provide a service or assistance that "is not authorized or required to be made available pursuant to the comprehensive annual services program plan then in effect" (*id.*; *see* Besharov, Practice Commentaries, McKinney's Cons Laws of NY, Book 29A, Family Ct Act § 1015-a [1999 ed] ["(Section 1015-a) authorizes the court to order social services officials to provide or arrange for needed services—*but only if the services are 'authorized or required to be made available pursuant to a comprehensive annual services program plan then in effect'* " (emphasis added)]).

In its memorandum of law submitted to Family Court (and again on appeal), ACS asserted that medical services are not part of the effective comprehensive annual services program plan; rather, medical services are provided to foster children by ACS in accordance with a "local medical plan" (18 NYCRR 501.1). Thus, a surgical procedure falls outside the scope of the comprehensive annual services program plan and Family Court cannot order ACS under Family Court Act § 1015-a to arrange for petitioner to have sex reassignment surgery. In opposition to ACS' prima facie showing that Family Court did not have the power under Family Court Act § 1015-a to direct ACS to arrange for petitioner's surgery, petitioner failed to raise a triable issue of fact. Neither before Family Court nor in her brief on this appeal did petitioner cite to any provision or section of the effective comprehensive annual services program plan authorizing or requiring ACS to arrange for her sex reassignment surgery. In fact, petitioner has not even asserted that the effective comprehensive annual services program plan authorizes or requires sex assignment surgery to be made available to her. We therefore conclude that no triable issue of fact exists as to whether Family Court had the power under Family Court Act § 1015-a to direct ACS to arrange for petitioner's surgery.

Lastly, while the parties devote extensive attention to the question of whether ACS' refusal to arrange for the surgery was arbitrary and capricious, i.e., did not have a rational basis, that question is not a proper subject of this proceeding. To obtain review of the determination of an administrative agency made in the absence of a hearing required by law, a party must commence a CPLR article 78 proceeding seeking mandamus to review (see CPLR 7801; Alexander, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C7801:3, at 32 [1994 ed]). An article 78 proceeding must be commenced in Supreme Court (CPLR 7804 [b]; Alexander, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C7804:2, at 647); it cannot be prosecuted in Family Court (Matter of Bowers v Bowers, 266 AD2d 741, 742-743 [1999]; Matter of Leonora M., 104 AD2d 755, 756 [1984]; Matter of Naima C., 39 AD2d 964, 965 [1972]). Thus, Family Court does not have subject matter jurisdiction to review ACS' refusal to arrange for petitioner to have sex reassignment surgery.[6] Rather, this proceeding involves the question of whether Family Court has the power to order ACS to arrange for petitioner to have the surgery, a question that is separate and distinct from whether that court has the jurisdiction to review an administrative determination of ACS.

Accordingly, we reverse the order directing ACS to arrange for petitioner to have sex reassignment surgery, deny petitioner's motion, grant ACS' cross motion and dismiss the proceeding. Concur—Andrias, J.P., Friedman, Sweeny and McGuire, JJ.

---

**6.** While neither of the parties raise the issue of whether Family Court lacked subject matter jurisdiction to review the administrative determination of ACS, we may reach it on our own volition (Matter of Fry v Village of Tarrytown, 89 NY2d 714, 718 [1997] ["a court's lack of subject matter jurisdiction is not waivable, but may be raised at any stage of the action, and the court may, ex mero motu (on its own motion), at any time, when its attention is called to the facts, refuse to proceed further and dismiss the action" (internal quotation marks omitted)]).