OPINION OF THE COURT
Peter H. Moulton, J.
Petitioner in this CPLR article 78 proceeding is transgender and in the care and custody of New York City’s Administration for Children’s Services (ACS). She seeks to reverse the determination by ACS dated October 15, 2013, that she is not eligible “at this time” for ACS’s payment for medical procedures that would address her diagnosis of gender dysphoria and allow her to conform her appearance to her female gender identity.
Respondent opposes the petition and asserts that its decision to deny payment for the procedures was not arbitrary and capricious. (CPLR 7803.) Respondent argues that petitioner’s chronic absences without leave from her foster care group residential placements, and concomitant failures to attend programs at these placements, indicate that there is a risk she would not be compliant with certain postoperative protocols.
Background
Petitioner’s assigned sex at birth was male but she has for a number of years identified as female. She is currently 20 years old. She has been diagnosed with gender dysphoria, which refers to an individual’s distress arising from incongruence between her experienced or expressed gender and the gender she was assigned at birth. Among other diagnostic criteria, a person with gender dysphoria has strong desires to be rid of her own sex characteristics and to adopt the sex characteristics of the opposite gender (or of some alternate gender different from one’s assigned gender).[1]
ACS does not contest petitioner’s gender dysphoria diagnosis.
*748 A. Petitioner’s Entry into Foster Care and Identification as Transgender
Petitioner and her sister entered foster care after ACS filed a petition of neglect against their parents in 2009. Petitioner had an extremely strained relationship with her parents. While still identifying as male, petitioner began at a young age to feel attracted to men and to question her gender. Petitioner’s parents criticized petitioner over her sexual orientation and gender expression. Petitioner’s father abused alcohol and committed acts of domestic violence against petitioner and her mother.
The domestic violence, and conflict with her parents oyer her sexual orientation and gender expression, resulted in petitioner experiencing suicidal ideations. According to case records, petitioner’s mother also suggested on more than one occasion that petitioner commit suicide.[2]
At disposition Family Court placed petitioner in Green Chimneys Gramercy Residence, a group home for lesbian, gay, bisexual, transgender and questioning (LGBTQ) youth. When petitioner entered foster care, she disclosed that she was transgender and began to request that her caregivers assist her in changing her legal status and her appearance to conform to her identity as a female. She successfully brought a petition in Civil Court to change her name. She changed her gender marker on her Social Security and New York State identification cards from “male” to “female.”
In August 2011, with the assistance of staff at her residential placement, petitioner began to explore the possibility of engaging in hormone therapy at the Callen-Lorde Community Health Center, where she attended the Health Outreach to Teens Clinic (HOTT Clinic). Under the supervision of physicians at the HOTT Clinic, petitioner began taking orally administered hormones. After discussions with physicians at the HOTT Clinic, in which she was instructed on the proper method to self-inject hormone treatments, she began administering the injections to herself using aseptic techniques. It is unclear from the record before the court if ACS knew at the outset that petitioner had begun hormone therapy. However, hormone therapy has been adopted by ACS as part of her family assessment and service plan.
While she regularly availed herself of the health services at Callen-Lorde, petitioner was frequently absent without leave *749 from Green Chimneys. These absences totaled more than 300 days over a four-year period. She also missed numerous appointments with Green Chimneys’ psychologist Dr. Jordan Conrad. In July 2013, after the Green Chimneys facility closed, petitioner moved into a new residence for LGBTQ youth run by SCO Family of Services (SCO). She has also been chronically absent from this new placement, and resides mostly at a friend’s house in Queens. Petitioner avers that SCO is considering certifying this home as a foster home.
It is unclear why petitioner was absent so often from two residences designed for LGBTQ youth, and petitioner does not submit an affidavit explaining the absences. However, despite her absences from Green Chimneys, Dr. Conrad submitted letters in support of petitioner’s applications to ACS for gender affirming procedures and therapies. Petitioner made these two applications pursuant to ACS policy No. 2010/04, which is entitled “Provision of Non-Medicaid Reimbursable Treatment or Services for Youth in Foster Care” (referred to herein as the NMR policy). It is ACS’s denial of petitioner’s second application that is the subject of this proceeding.
The NMR policy is discussed below.
B. ACS’s NMR Policy
ACS is required to provide “necessary medical or surgical care” for all children in foster care. (Social Services Law § 398 [6] [c]; 18 NYCRR 441.22.) Section 398 (6) (c) requires ACS to
“[plrovide necessary medical or surgical care in a suitable hospital, sanatorium, preventorium or other institution or in his own home for any child needing such care and pay for such care from public funds, if necessary. However, in the case of a child or minor who is eligible to receive care as medical assistance for needy persons pursuant to [the Medicaid statute], such care shall be provided pursuant to the provisions of [the Medicaid statute].”
New York State Medicaid excludes coverage of costs relating to “care, services, drugs, or supplies rendered for the purpose of gender reassignment (also known as transsexual surgery) or any care, services, drugs, or supplies intended to promote such treatment.” (18 NYCRR 505.2 [1].) In Matter of Brian L. v Administration for Children’s Servs. (51 AD3d 488 [2008], lv denied 11 NY3d 703 [2008]) the First Department held that ACS has a duty to “provide necessary medical and surgical care *750 to all of the children in its care and must, if necessary, pay for that care” where Medicaid does not provide reimbursement. (Id. at 494.)
On June 7, 2010, ACS instituted the NMR policy to provide a procedure for review of requests for payment of medically necessary treatment not covered by Medicaid. The NMR policy and a subsequent memorandum dated January 29, 2013, entitled “NMR Guidance for Trans-Related Healthcare” (NMR Guidance) provide that a foster care agency must first determine if there are other sources of funds, such as family and friends, that could pay for the requested procedures. If it determines that there are no such sources of financial support, the agency then submits to ACS various forms and statements from medical professionals concerning, inter alia, the need for the requested therapies and procedures. Applications for certain types of procedures, including surgeries, are submitted to the “ACS Health Review Committee.” The ACS Health Review Committee reviews the materials and then makes a recommendation to the ACS Deputy Commissioner who has been delegated the responsibility of final decision-maker. The NMR policy provides that the ACS Health Review Committee has the discretion to consult with “specialist(s) from the field(s) in which a particular type of treatment or care is being requested.” (NMR policy at 7.)
Both the NMR policy and the NMR Guidance provide that decisions concerning heath care for transgender people in ACS’s care shall be made according to the standards of care established by the World Professional Association for Transgender Health (the WPATH standards of care).[3] Pursuant to the NMR Guidance, an application for gender affirming treatment and procedures must be “demonstrated to be effective based on current medical and mental health standards” as measured by the WPATH standards of care.
C. Petitioner’s Two Applications Pursuant to the NMR Policy
On May 2, 2012, Green Chimneys submitted to ACS a written request for payment on petitioner’s behalf for breast augmentation, tracheal shaving, and laser hair removal. The request was subsequently augmented with additional information sought by ACS. These materials included letters from Dr. Daniel Garza, a *751 psychiatrist at the HOTT Clinic, Dr. Paul Weiss, the surgeon who would perform the requested procedures, Dr. Conrad, the psychologist at Green Chimneys, and Dr. Carmen Alonso, a psychiatrist also associated with Green Chimneys. Dr. Alonso’s report summarizes the reasons that the procedures are necessary:
“[Petitioner] meets criteria for diagnosis of gender identity disorder (GID), including a diagnosis of true transsexualism. She has demonstrated the desire and to live and be accepted as a female, in addition to a desire to make her body as congruent as possible with her preferred female identity, through hormone replacement for over two years. [Petitioner] has described a persistent feeling of discomfort regarding her gender assigned at birth since early adolescence, as well as clinically relevant distress and impaired ability to function in social, school or work-related situations as a result of her preoccupation with nonidentification with her assigned birth gender. [Petitioner’s] transsexualism is not due to another mental disorder or chromosome abnormality. She has successfully lived and gone to school within her desired female gender role full-time for two years (real life experience) without returning to her original gender.”
Petitioner’s first application was submitted to the ACS Health Review Committee, which approved the request in its entirety. In its recommendation, the Health Review Committee noted petitioner’s repeated absences from her residence, but nonetheless recommended that ACS approve the procedures.
Petitioner’s first application was denied by Deputy Commissioner Benita Miller in a letter dated July 11, 2013. The denial was based on petitioner’s alleged failure to receive “ongoing psychiatric care.” In addition the letter invoked petitioner’s frequent absences from Green Chimneys, and her “history of missing health appointments at the Gramercy Residence.” The letter also noted that petitioner had requested other surgeries since submitting her initial application, but that she had not embodied these requests in a new NMR policy application. Petitioner sought a fair hearing review of the denial of her first application. The hearing officer held that the Deputy Commissioner’s decision was final and unreviewable. Petitioner initially sought, inter alia, a reversal of the hearing officer’s decision and a remand to ACS’s Office of Temporary Disability Assis *752 tance. Petitioner subsequently dropped this request for relief. She now focuses her challenge to the Deputy Commissioner’s denial of petitioner’s second application, which is described below.
Petitioner submitted her second application on July 18, 2013, which requested five procedures: (1) full sexual reassignment surgery, (2) facial feminization, (3) tracheal shaving, (4) breast augmentation and (5) laser hair removal. The second application relied on the materials included in the first application and included, inter alia, new letters from both Dr. Garza and Dr. Alonso. Dr. Garza notes that hormone treatment is “insufficient to [petitioner’s] ultimate goals,” and states that the proposed procedures “would serve a therapeutic purpose and improve her well-being.” Dr. Alonso states: “[Petitioner’s] clinically relevant distress causing impaired ability to function in social, school or work-related situations as a result of her preoccupation with non-identification with her gender assigned at birth (Gender Dysphoria) will only be significantly resolved by undergoing her desired gender-affirming healthcare procedures.” Both doctors found that petitioner understood the risks of gender confirmation surgery and was able to provide informed consent. The total cost of all five procedures, based on the quotes submitted with the two applications, would be approximately $46,000.
ACS did not submit the second request to the ACS Health Review Committee. The reasons for this departure from the procedures set forth in the NMR policy and Guidance are not clearly explained in respondent’s papers. The answer to the petition states only that the second application was not submitted to the Committee because “it was submitted so closely in time to ACS’s denial of the First Request and essentially repeated the First Request with added requests for two additional procedures.”
Instead, ACS consulted with an independent specialist, Dr. John Steever. Dr. Steever is an assistant professor of pediatrics and adolescent medicine at the Icahn School of Medicine at Mount Sinai. He has long focused on the health issues facing LGBTQ youth. As an attending physician at Mount Sinai’s transgender health program he has seen more than 75 patients from ages 9 to 22 for trans-related health services since 2005.
Dr. Steever reviewed petitioner’s health records and certain foster care records. He did not meet with petitioner in conducting his review, although the opportunity was provided to him. *753 Dr. Steever has reiterated through ACS’s counsel and through an affidavit submitted in this proceeding that he does not need to meet with petitioner in order to render his opinion. Instead, relying solely on petitioner’s records, Dr. Steever concluded that it was in petitioner’s best interest to defer the requested procedures. He based this conclusion on petitioner’s “poor adherence to ACS recommendations and programs.” Specifically, Dr. Steever found that petitioner’s chronic absences without leave from her residence, and failure to consistently meet with the therapist at her residence, placed her health and safety at risk. He also noted that petitioner missed a court appearance in her name change proceeding. Based on her absences, and failure to follow through on agency directions, Dr. Steever opined that petitioner might fail to follow directions concerning her postoperative care, which could potentially result in infections, unnecessary scarring, urinary problems, and sexual sensation problems.
While Dr. Steever agrees that petitioner has been correctly diagnosed with gender dysphoria, he states in his affidavit that the procedures sought by petitioner are not “emergent in nature” (i.e., not necessary to address emergencies) and that they can be deferred until such time as the patient can comply with the necessary follow-up care. He does not address how a transgender young adult, aging out of foster care with no family support and few apparent prospects for employment, might pay for these procedures.
Deputy Commissioner Miller denied the second application in a letter dated October 15, 2013. The letter explicitly relies on the analysis and conclusion of Dr. Steever.
Discussion
It is well-settled that “ [jjudicial review of administrative determinations is confined to the facts and record adduced before the agency.” (Matter of Yarbough v Franco, 95 NY2d 342, 347 [2000] [internal quotation marks omitted].) The reviewing court may not substitute its judgment for that of the agency’s, and the decision will be upheld if it is supported by any rational basis. (Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County, 34 NY2d 222, 231 [1974].) The First Department has held that ACS’s denial of trans-related health care to people in its care is to be judged by whether the denial was arbitrary and capricious. (Brian L., 51 AD3d at 500.)
*754 It is important to make clear that ACS’s denial is not based on any dispute about petitioner’s diagnosis of gender dysphoria, or that surgery is a medically accepted means of treating gender dysphoria. While not all transgender people seek surgery to align their appearance more closely with their gender identity, various surgeries are established treatments for people with gender dysphoria. New York courts have long understood that such treatment is not the equivalent of elective plastic surgery. (See Davidson v Aetna Life & Cas. Ins. Co., 101 Misc 2d 1 [Sup Ct, NY County 1979].) Rather, the proposed treatment is therapeutic, designed to address a particular diagnosis. ACS’s denial is also not based on some specious supposition that petitioner is “going through a phase” and that she may change her mind about wanting irreversible gender affirming surgeries. Her consistency since coming out as transgender, and the opinions of psychiatrists who have treated her, foreclose that argument.
ACS’s denial here was based on Dr. Steever’s assessment that petitioner may not be capable “at this time” of following the necessary postoperative steps to ensure a healthy recovery from the five procedures sought by petitioner. It is unclear from respondent’s papers what postoperative protocol is required by one of the procedures, laser hair removal. The remaining four procedures clearly require that a patient attend to certain postoperative procedures. This is particularly the case with respect to sexual reassignment surgery.
This reason for denial has facial validity. A doctor, one with evident expertise with transgender patients, states that postoperative wound care is important. This is an assertion which appears unassailable, and which is not disputed by petitioner.
However, the decision is nonetheless arbitrary and capricious for several reasons.
The decision rests on the premise that has no foundation in the record: that petitioner’s chronic absences without leave from her group homes, and her failure to consistently participate in programs at those group homes, are indicators that she will not participate in necessary postoperative care. The mental health professionals who supported petitioner’s applications all knew of her chronic absences, yet all stated that she needed the surgeries and procedures in question. None of them questioned whether petitioner would follow through with postoperative *755 care.[4] These physicians had direct evidence of petitioner’s capacity and willingness to engage in the tasks that are required by her transition. Her medical records show that petitioner has demonstrated commitment and maturity in dealing with her health care, both trans-related and non-trans-related. Her consistency in following protocols for hormone therapy is noted above. She has repeatedly and consistently tested negative for STDs and HIV There is no indication that she has participated in negative behaviors such as drug or alcohol abuse. It is arbitrary and capricious for an agency to render a decision unsupported by the record before it. (E.g. Metropolitan Taxicab Bd. of Trade v New York City Taxi & Limousine Commn., 18 NY3d 329, 334 [2011] [“Absent a predicate in the proof to be found in the record, (an) unsupported determination . . . must ... be set aside as without rational basis and wholly arbitrary” (internal quotation marks and citation omitted)].)
Additionally, the decision is arbitrary and capricious because ACS did not follow its own procedures in reaching the decision. The WPATH standards of care, which ACS purports to follow in the NMR policy and Guidance, state that “[g]enital and breast/ chest surgeries as medically necessary treatments for gender dysphoria are to be undertaken only after assessment of the patient by qualified mental health professionals.” (World Professional Association for Transgender Health, Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People at 55 [7th version].) Petitioner has undergone such assessments, and the mental health professionals in question agree that she should undergo the surgeries requested. Dr. Steever, while he may be an experienced clinician, is a pediatrician, not a mental health professional.
It was also a deviation from the WPATH standards of care for ACS to follow the recommendation of a physician who had not met with petitioner. The WPATH standards of care set forth “Tasks Related to Assessment and Referral” to be followed by mental health professionals working with transgender patients. All of these tasks involve actually treating a patient by meeting with her. Only by meeting with a patient as many times as nec *756 essary to render a diagnosis and determine appropriate treatment can a mental health professional refer the patient for a range of potential treatments including hormone therapy and surgery. (See World Professional Association for Transgender Health, Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People at 21-33 [7th version].) The doctors who met with petitioner multiple times were able to make that assessment. The doctor upon whom ACS relied did not meet once with petitioner.
ACS also failed to follow its own procedures by failing to refer petitioner’s second application to the ACS Health Review Committee. The NMR policy provides: “When the request falls under one of the special categories of treatment or services as identified above [including gender affirming surgeries], or whenever the Deputy Commissioner requires additional clinical advice, the Deputy Commissioner will refer the requests to the Health Review Committee.” (NMR policy at 6.) The first application was submitted to the ACS Health Review Committee, and the Committee recommended payment for all the procedures requested. For unexplained reasons, the second application was not given to the ACS Health Review Committee despite the mandatory language in the NMR policy. The Deputy Commissioner sought “additional clinical advice” not from the Committee, as provided in the NMR policy, but from Dr. Steever.
An agency’s failure to follow its own procedures or rules in rendering a decision is arbitrary and capricious. (E.g. Matter of Gilman v New York State Div. of Hous. & Community Renewal, 99 NY2d 144 [2002]; Matter of Frick v Bahou, 56 NY2d 777 [1982].)
Apart from ACS’s failure to follow its own procedures, the NMR policy and Guidance contain a fundamental flaw: they give complete discretion to the relevant Deputy Commissioner to approve or disapprove gender affirming surgeries and procedures. This discretion is unlimited. It is true that the NMR policy enumerates five criteria that an applicant must satisfy before ACS will pay for a treatment.[5] Presumably, these five criteria are meant to determine when a procedure is “necessary *757 medical or surgical care” that must be paid for by ACS pursuant to Social Services Law § 398 (6) (c). However, even where a petitioner meets all five criteria, the Deputy Commissioner may deny the request for treatment. The Deputy Commissioner may thus determine what medical or surgical care is “necessary” without having to justify his or her decision by reference to any specified set of criteria. This procedure allows ACS to deny payment for medically necessary care, in derogation of its duty under Social Services Law § 398 (6) (c). The adoption of a procedure allowing for unfettered discretion in agency decision making is arbitrary and capricious. (See Matter of Nicholas v Kahn, 47 NY2d 24, 33-34 [1979].)
In Nicholas the Public Service Commission adopted rules prohibiting various employees, and their children and spouses, from owning any interest in certain business concerns whose performance was related to companies regulated by the Commission. The rules provided for certain exemptions. The Court of Appeals held that the exemptions were not governed by any objective standards and so were arbitrary and capricious. The Court held:
“While it is certainly not fatal that the decision is left to the discretion of the chairman, an administrative agency is forbidden from exercising its discretionary power without first detailing standards or guides to govern the exercise of that discretion .... “[W]here, as here, the rules delegate unfettered discretion to the chairman with inadequate safeguards against the exercise of arbitrary power or simple unfairness, a denial of a requested exemption is arbitrary and capricious as a matter of law.” (Nicholas, 47 NY2d at 34 [citations omitted].)
Finally, the NMR policy and Guidance do not address at all an important economic factor that intersects with the clinical decision to withhold care. As discussed above, Dr. Steever judged that petitioner’s gender dysphoria did not require treatment with the requested procedures “at this time” because she might not follow necessary postoperative protocols. The implication of this temporal limitation, which was adopted by the Deputy Commissioner in her denial, is that petitioner may, at some later *758 time, be ready for postoperative protocols and, therefore, be ready for the surgery.
ACS’s denial of the requested surgeries and procedures “at this time” thus completely ignores another factor: petitioner’s almost certain inability to pay for these surgeries and procedures. Once she ages out of foster care,[6] *8 petitioner’s chances of raising the money necessary to pay for these procedures appear to be nil. Certainly for the near future her inability to pay for the procedures is clear. She has yet to complete her GED. She is estranged from her family. She faces a transphobic society that discriminates against transgender people in employment, housing and the distribution of other opportunities and resources. While there are increasing legal protections for transgender people in some jurisdictions via statute, court decisions, and executive orders, most jurisdictions do not have anti-discrimination laws that explicitly cover transgender people.
The inability to pay for gender affirming surgeries and procedures after foster care is not a factor that should trump clinical factors, but it certainly should not be absent from ACS’s decision making. Payment by ACS for necessary medical procedures may be a transgender youth’s only chance to achieve congruence between her gender identity and her physical appearance. Accordingly, ACS’s omission of this factor from its NMR policy and Guidance is arbitrary and capricious.
Conclusion
For the reasons stated, it is ordered and adjudged that the decision of respondent Administration for Children’s Services dated October 15, 2013 is annulled; and it is further ordered and adjudged that Administration for Children’s Services shall take all steps necessary to pay for the procedures specified in petitioner’s application dated July 18, 2013.

. The diagnosis is described in full at Diagnostic and Statistical Manual of Mental Disorders at 451-459 (5th ed 2013).

. Petitioner’s parents have not participated in her permanency planning while petitioner has been in foster care.

. World Professional Association for Transgender Health, Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People (7th version).

. In supplementary affirmations, petitioner’s two attorneys attempt to provide relevant background concerning surgical recovery. They recite conversations with (1) staff of the surgeon who will perform the sexual reassignment surgery, and (2) the plastic surgeon who will perform the other surgeries. This information is hearsay and is not considered by the court for any purpose.

. The five criteria, in summary, are (1) the treatment must be supported by a statement from a qualified medical or mental health professional, (2) the treatment is expected to relieve substantial psychological and/or physical distress, (3) the proposed treatment is demonstrated to be effective based on current medical standards, (4) there is significant benefit to the child/youth, *757 as documented by a qualified medical or mental health professional stating the risks and benefits of the proposed procedure and (5) Medicaid funding is unavailable. (NMR policy at 5-6.)

. ACS’s responsibility for youth in its care usually terminates when the youth turns 21. Apparently, ACS is able to continue care for some individuals for a limited period after they reach the age of 21 when necessary to complete permanency planning.